J-S58021-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: M.L., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: D.L., NATURAL FATHER | |
| | No. 747 MDA 2017 |

Appeal from the Order Entered April 13, 2017
In the Court of Common Pleas of Adams County
Juvenile Division at No(s): CP-01-DP-0000021-2015

| | |
|---|---|
| IN THE INTEREST OF: M.L., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: D.L., NATURAL FATHER | |
| | No. 748 MDA 2017 |

Appeal from the Order Entered April 5, 2017
In the Court of Common Pleas of Adams County
Orphans' Court at No(s): RT-16-2016 (A)

BEFORE:  GANTMAN, P.J., SHOGAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SHOGAN, J.:                    **FILED NOVEMBER 06, 2017**

Appellant, D.L. ("Father"), appeals from the trial court's order entered April 5, 2017, which granted the petition filed by Adams County Children and Youth Services ("CYS") to involuntarily terminate, pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b), his parental rights to his daughter, M.L.

("Child"), born in August of 2015. Father also appeals from the order entered April 13, 2017, changing Child's permanency goal to adoption pursuant to 42 Pa.C.S. § 6351.[1, 2] We affirm.

The trial court thoroughly summarized the relevant facts and procedural history of this case, which the trial court read into the record in open court on March 28, 2017, in pertinent part, as follows:

* * *

9. Prior to [Child's] birth, Dauphin County Social Services [("Dauphin CYS")] were concerned over the unborn child's well-being due to concerns expressed by prenatal providers concerning [M]other's low level of functioning and [F]ather's controlling behavior. Additionally, concerns were fueled by Dauphin [CYS's] interaction and experience with the family while involved with family concerning the child, J.L.

10. At the birth of [Child], Lancaster Hospital officials contacted Dauphin [CYS], who in turn responded to the hospital to take custody of the newborn. At that time[, F]ather appeared to be recording the interaction on his cell phone and expressed that Dauphin [CYS] did not have jurisdiction as [M]other and [F]ather had moved to Gettysburg.

* * *

14. Dauphin [CYS] took custody of [Child] and placed her in a foster care home on August 14, 2015.

---

[1] The April 13, 2017 order also noted that B.L.'s (Mother's) parental rights had been involuntarily terminated with respect to Child. Mother did not file a separate appeal, nor is Mother a party to the instant appeal.

[2] Mother and Father have another child, J.L., who is not the subject of this appeal. Mother's parental rights to J.L. were involuntarily terminated and Father's parental rights were terminated by consent in the fall of 2015.

15. On August 17, 2015, the Honorable John F. Cherry of the Dauphin County Court of Common Pleas entered [an] emergency shelter care order directing that [Child] remain in placement in foster care.

16. On August 31, 2015, Judge Cherry transferred jurisdiction of the matter involving [Child] to the Adams County Court of Common Pleas, who in turn accepted jurisdiction by order dated September 11, 2015.

17. On October 13, 2015, the Honorable Judge John Kuhn adjudicated [Child] dependent and continued her placement in foster care.

18. On November 9, 2015, at [a] dispositional hearing[,] the [c]ourt established a goal of reunification with a concurrent goal of adoption. [Child] remained in foster care with a plan to transfer her to kinship care in the home of the biological aunt of [F]ather[,] who at the time had an amicable relationship with [F]ather.

19. At the November 9, 2015[] dispositional hearing[,] with [F]ather's agreement, he was ordered not to possess a firearm except for employment purposes, in case [sic] firearm was not to be kept at the family residence. Also at the dispositional hearing, a plan accepted by all parties was adopted. The plan included:

> A. Parents to attend visits and medical appointments of [Child], and confirm visits with [Child] with the Adams [CYS] the day before the scheduled visit.
>
> B. Father addressed anger management with a professional provider.
>
> C. The parents will participate in out–patient mental health counseling including medical management and follow through with all treatment recommendations.
>
> D. The parents participate in intensive parenting services.

- 3 -

E. That the parents execute releases to [CYS] to obtain appropriate relevant information.

F. That the parents verify employment and their financial status with [CYS] and,

G. The parents would provide stable and save [sic] residence for [Child], and demonstrate the ability to provide appropriate and safe care for [Child].

20. In developing a plan, [CYS] was aware of both parents having a history of mental health issues and [M]other's inability to provide basic care for [Child].

21. Accordingly, those issues were of some primacy to [CYS] as was expressed to the parties.

22. At a permanency review hearing, which was held on January 19, 2016, the [c]ourt found the parents' compliance with the plan to be minimal.

23. The parents did not attend medical appointments and visit attendance with [Child] was sporadic although [F]ather claimed difficulty due to work conflicts.

24. Father further advised the [c]ourt that he was participating in anger management counseling and mental health counseling with Well Span Health[,] but failed to provide verifiable proof. Mother would not identify who any service providers were. The parties failed to follow through with Justice Works, an in-home service provider recommended by [CYS], and therefore, services were terminated. The [c]ourt was further advised that neither [F]ather [n]or [M]other provided employment or financial status information. Although the parents were living with [F]ather's mother, [CYS] was advised that that living arrangement would end in January of 2016, as [F]ather's mother was unwilling to further permit the parties to reside in her home.

25. During visits with [Child], [M]other continued to display an inability to provide basic parenting skills. While [F]ather was able to demonstrate simple care giving skills, he failed to recognize [M]other's shortcomings. Additionally, during this

reporting period, [CYS] reported that [F]ather was often argumentative, evasive, and manipulative in dealing with [CYS].

26. On February 25, 2016, [CYS] filed a motion seeking a finding of aggravated circumstances against [M]other based upon the prior involuntary termination of her parental rights to the child, J.L.

27. A permanency review hearing was conducted on April 12, 2016, at which time it was discussed that visitation was still sporadic, however, more consistent as [F]ather was providing transportation for [Child] in his vehicle. Nevertheless, the parents continued not to attend [Child's] medical appointments.

28. It became more apparent that [M]other is incapable of providing basic care to [Child] and [F]ather, who appeared capable, was requested to develop a viable plan for [Child's] care when he was unavailable due to his work schedule. Father still had difficulty accepting [M]other's shortcomings in providing child care.

29. His hostility with [CYS] continued to increase. Both parents claimed to have been undergoing mental health counseling and indicated that they requested verification of the records from the service provider but those records had not yet been provided. The parents had moved from [F]ather's mother's residence to an apartment in Littlestown and both parents claimed they were employed but did not yet provide verification or basic information concerning their employment.

30. Following permanency review hearing, [Child] remained in kinship foster care.

31. Following the permanency review hearing conducted on February 25, 2016, the [c]ourt Ordered:

A. Father to undergo mental health evaluation, comply with all treatment recommendations and provide verification to [CYS].

B. Secondly, [F]ather present viable reunification plan to the [c]ourt and [CYS] within 60 days of the date of the Order.

C. Father to attend and successfully complete anger management counseling and provide verification of the same and,

D. Father to verify his employment in a means that [CYS] was able to ascertain the accuracy of the employment representations.

32. [On] April 12, 2016, aggravating circumstances were found to exist against [M]other.

33. [CYS] filed an emergency petition which was . . . held on May 24, 2016. At that time [CYS] expressed concern over [F]ather's mental health, his lack of a valid driver's license, and failure to provide reunification plan. Additionally, sporadic visitation was causing issues with the kinship providers in providing for [Child's] physical and emotional well-being.

34. [CYS] presented evidence of approximately 14 traffic citations against [F]ather verifying that his license was suspended while he was providing transportation of [Child] to visitation. Information indicated that Father's license had been suspended in late 2015, and even as of this writing, remains suspended. Mother does not drive.

35. As transportation for visitation was at issue as well as [F]ather's failure to obtain mental health evaluation, [CYS] was seeking limitation on the parties' visitation.

36. On July 20, 2016, [a] permanency review hearing was conducted. Father and [M]other had not had visits with [Child] since May 18, 2016, nor had [they] attended any medical visits during the relevant reporting period. Father had provided mental health records to [CYS] but all of those records predated January 1, 2016. The records provided indicated that [F]ather suffers from a diagnosis of depression and in the past has had suicidal ideations. As of this reporting period, [F]ather has not provided any other verification of his compliance with mental health evaluation and treatment since January of 2016. Mother had signed a mental health records release, however, no records were found. Neither parent provided any employment information.

37. It was also discovered at hearing that [F]ather was subsequently cited for driving under suspension and impersonating an emergency service provider. Father's compliance with recommended service providers was nonexistent causing service providers to cease termination of their services. Contrary to the direction in the Order of February 25, 2016, [F]ather did not provide [CYS] or the [c]ourt with a reunification plan. [Child] was Ordered to remain in kinship foster care. As of the date of hearing, [Child] had been in care of [CYS] for her entire life of approximately nine months.

38. After hearing testimony, the [c]ourt found there had been no compliance by either [F]ather or [M]other with efforts to reunify with [Child].

39. Due to the increasing concerns of the safety of [Child] when in the presence of the parents, the [c]ourt suspended [F]ather's unsupervised visitation until mental health evaluation and treatment compliance was verified to [CYS]. Additionally, [F]ather was given a second opportunity and Ordered to provide a reunification plan within 30 days. He was further directed to execute releases to any anger management treatment or mental health treatment which he was undergoing and provide verification of stable housing and financial viability. Due to the issues arising concerning visitation, [F]ather was again directed to provide verifiable proof of his work schedule in order to permit [CYS] to cooperate with that schedule in arranging visitation. Although [F]ather's unsupervised visits were restricted, in the event he provided the mental health records and executed appropriate releases, visitation would be permitted in the presence of [CYS]. Father was directed to undergo mental health evaluation as arranged by [CYS].

40. On August 22, 2016, after reasonable notice to [F]ather and despite that reasonable notice, [F]ather failed to attend mental health evaluation scheduled by [CYS]. The mental health provider with whom the evaluation was scheduled . . . outside of normal providers used by [CYS] in order to accommodate [F]ather's paranoia concerning interactions with [CYS].

41. On September 27, 2016, [a] permanency review hearing was conducted by the [c]ourt. At that time it was discovered that the parents had been evicted from the Littlestown property. However, [F]ather indicated to the [c]ourt that he had not been

so evicted. Father's representation is contrary to the factual record as determined by the [c]ourt. At the time of [the] permanency hearing on September 27, 2016, [F]ather would not release his address other than a statement concerning the status of the Littlestown apartment and it was believed that the parents were currently homeless.

42. During the relevant reporting period, supervised visits with the parents were either canceled due to the parents['] failure to appear, the appointments which weren't canceled were shortened due to the parents habitually appearing late.

43. Neither [M]other nor [F]ather attended any medical appointments of [Child] during the relevant reporting period. It was discovered since last proceedings, [F]ather had been arrested for impersonating a constable and felony burglary. It was further discovered that when law enforcement officials executed the search warrant at [F]ather's residence, . . . he had a loaded firearm on the property.

44. Father claimed that he was consulting with a mental health provider in Hanover, and when directed by the [c]ourt to execute a release to verify his representation to the [c]ourt, he subsequently in meeting with [CYS] executed the release but wrote on the release "under protest" which caused the service provider not to honor it.

45. Father failed once again to provide proof of any anger management treatment or counseling. Although he provided some information in verification of his employment, that verification indicated that he was only working 20 to 25 hours per week. A reunification plan had still not been completed and provided by father as directed on at least two prior occasions by [c]ourt [o]rder. The [c]ourt found that there was no compliance on the part of [F]ather or [M]other in making efforts towards reunification. [CYS] advised that they would be proceeding with involuntary termination of parental rights.

* * *

48. During the period of time from November 21, 2016 through January 5, 2017, [F]ather was incarcerated at the Adams County Prison as a result of conviction or convictions resulting from the charges contained in the burglary complaint referenced above.

During this relevant time period, [CYS] was unaware of [M]other's location, however, believed she had returned to an address in Lebanon where she resided with her mother. There is essentially no communication between parents and [CYS] since the September 27, 2016, permanency review hearing.

* * *

50. The last mental health or psychiatric evaluation conducted on [F]ather appears to be psychiatric evaluation conducted on November 22, 2014, by Doctor Rosen. Doctor Rosen expressed his concern in that evaluation that Father's personality traits indicated a high risk of future child abuse and neglect. Doctor Rosen observed [F]ather to be defiant to authority, angry, impulsive and reckless. [Doctor Rosen] recommended that [F]ather participate in a child abuse prevention program. Doctor Rosen at that same time conducted an evaluation of [M]other and discovered that [M]other has mild intellectual disability with an operating IQ of 54.

N.T., 3/28/17, at 2-14.

On December 28, 2016, CYS filed a petition to terminate Father's parental rights to Child. On January 17, 2017, CYS supplemented the petition, and hearings were held on March 13, 2017, and March 23, 2017. On March 28, 2017, the trial court orally delivered its order terminating Father's parental rights and changing Child's permanency goal to adoption. The trial court docketed its order terminating Father's parental rights on April 5, 2017. The trial court docketed its order changing Child's permanency goal to adoption on April 13, 2017. On April 28, 2017, Father filed timely notices of appeal along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed its opinion on May 24, 2017. By motion dated June 13,

2017, Father requested this Court to consolidate his appeals. We granted

the motion on June 14, 2017.

On appeal, Father raises the following issues for our review:

1. Whether the trial court erred as a matter of law and abused its discretion to find [CYS] had met its burden in determining that clear and convincing evidence existed to terminate Father's parental rights to [Child] pursuant to 23 Pa.C.S. §[ ]2511(a)(1), (2), (5) and (8)?

2. Whether the trial court erred as a matter of law and therefore abuse[d] its discretion in determining that, even if [CYS] had met its burden under the plead subsections 23 Pa.C.S. § [ ] 2511(a), that it was in [Child's] best interests under 23 Pa.C.S. §[ ] 2511(b) to terminate parental rights, given the acknowledgement during a time of regular visitation, Father was the sole caregiver and enjoyed a parent-child relationship with [Child], especially given the fact when the termination proceeding followed a period of time where Father's visitation was suspended due to [CYS's] perceived failures of Father to comply with their guidelines, which had nothing to do with [Child's] safety, nor was Father's contact with [Child] placing [Child] at a grave risk of either emotional or physical harm?

3. Was trial court's determination err [sic] as a matter of law and abuse [of] its discretion finding that a goal change from reunification to adoption was in the best interests of [Child] where there was not clear and convincing evidence presented as to the goal change being in the best interests of the child and where [CYS] had not made reasonable efforts, specifically to continue to facilitate and enrich the parent–child relationship, by continually reducing and eventually suspending visitation as a consequence and only granting minimal weekly contact, despite visitation of a parent with their child being a right not a privilege?

Father's Brief at 3-5.[3]

We review an appeal from the termination of parental rights in accordance with the following standard:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotation marks omitted).

When deciding a case falling under Section 2511, the trial court must engage in a bifurcated process.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in

---

[3] While Father's statement of questions involved indicates that he is raising three separate issues, his brief contains only a single argument section addressing all of his issues in one discussion. Thus, Father's brief does not comply with Rule 2119, which provides that "[t]he argument shall be divided into as many parts as there are questions to be argued." Pa.R.A.P. 2119(a). While this defect may be considered to be substantial, it does not preclude our review of this matter.

the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

"In termination cases, the burden is upon [the petitioner] to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

Father's first issue challenges the termination of his parental rights under Section 2511(a). Father contends that "he had resolved the issues which not only led to [Child's] placement but additional concerns noted during the life of the case." Father's Brief at 37. In particular, Father asserts that "[w]ithin weeks" of his release from prison in January 2017, Father had obtained employment and provided CYS with his work schedule. *Id.* at 34. "Father also provided a lease to [CYS] which showed a lease paid through March 2017." *Id.* Father also argues that he attempted to visit Child, but "the difficulties in meeting all other requirements and being the

- 12 -

primary financial income aside from Mother's SSI and Mother's primary care giver along with transportation issues, made visitation difficult." *Id.* at 34-35.

We note that the trial court terminated Father's parental rights to Child pursuant to subsections (1), (2), (5) and (8) of Section 2511(a). "This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a)." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we focus our analysis on Section 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence that the following three conditions are met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003); 23 Pa.C.S. § 2511(a)(2). The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002).

In granting CYS's petition for involuntary termination, the trial court made the following determination:

> [T]his record supports a finding of the repeated and continued refusal of Father to take steps to provide the child essential parental care necessary to her physical and mental well-being which Father will not remedy. Father's blatant disregard, after numerous unequivocal requests, to comply with reasonable safeguards aimed at establishing a reunification plan for a period in excess of 12 months is indicative of Father's unwillingness to remedy the situation which caused initial placement.

Trial Court Opinion, 5/24/17, at 7 (citations omitted).

The certified record reveals that Father has caused Child to be without essential parental care and Father will not remedy the conditions that caused the incapacity within a reasonable time. CYS established the following objectives for Father: attend visits and medical appointments of Child and confirm visits with Child with CYS the day before the scheduled visit; address anger management with a professional provider; participate in out-patient mental health counseling and follow through with all treatment recommendations; participate in intensive parenting services; execute releases to CYS; verify employment and financial status; provide a stable and safe residence for Child; and demonstrate the ability to provide appropriate and safe care for Child. Findings of Fact, 4/5/17, at 4-5 (unpaginated).

Regarding Father's objective to visit with Child and attend medical appointments, Father's compliance was minimal. In particular, CYS caseworker, Kimberly Hernandez, testified that the majority of Father's visits

with Child occurred between birth and nine months. N.T., 3/13/17, at 39. After CYS discovered that Father was driving with a suspended license, CYS required that visits with Child occur at the agency as Father could no longer transport Child to and from visits. *Id.* at 34-35. Thereafter, Father's visits with Child became sporadic; Father did not visit with Child from May of 2016 through July 20, 2016, September of 2016 through mid-October of 2016, and November of 2016 through January of 2017. *Id.* at 51-55. Father frequently failed to confirm his visits or would arrive late to visits.[4] *Id.* at 46-47.

Moreover, Child's foster mother, Paternal Aunt, testified that she attended every medical appointment and that Father failed to attend a single appointment. N.T., 3/13/17, at 179-180. Paternal Aunt testified that Father's contact with Child was "sporadic" and that Father would go for two to three months without contacting Child. *Id.* at 178-179.

With regard to his objective to participate in anger management and parenting classes, Father, again, was minimally compliant. Notably, Ms. Hernandez testified that CYS had no verification that Father participated in anger management treatment. N.T., 3/13/17, at 59. Further, Ms. Hernandez testified that Father was offered participation in the Nurturing

---

[4] Notably, Father arrived late to the termination hearing on March 13, 2017, and failed to appear for the hearing on March 23, 2017. Consequently, Father's attorney was unable to call Father as a witness to testify in his own behalf. N.T., 3/13/17, at 3-4, 27; N.T., 3/23/17, at 242-246.

Parenting Program, but Father was discharged "due to noncompliance or no contact with the program." *Id.* at 40.

Similarly, Father failed to maintain stable housing. Father initially obtained independent housing in February of 2016. Nevertheless, in September of 2016, Father was evicted from this residence. N.T., 3/13/17, at 46, 61. Father obtained new housing in February of 2017 and notified CYS that his rent was paid in full until March of 2017. *Id.* at 61. However, CYS noted its concern regarding Father's ability to continue paying rent based on his history of eviction and inability to provide documentation of employment. *Id.* at 62. "[T]hroughout the life of the case, [CYS] only received three weeks of work schedules, even though [CYS had] consistently asked for a solid work schedule plan." *Id.* at 51.

Based on the foregoing, we reject Father's assertion that the trial court erred in terminating his parental rights based on his efforts to fulfill the objectives set forth by CYS. Therefore, we discern no abuse of discretion or error of law in the trial court's determination that termination was warranted under Section 2511(a)(2).

In his second issue, Father argues the trial court erred in finding that termination of his parental rights would best serve the developmental, physical, and emotional needs and welfare of Child under Section 2511(b). "Section 2511(b) 'focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of

the child.'" ***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super.

2015) (quoting ***In re Adoption of J.M.,*** 991 A.2d 321, 324 (Pa. Super.

2010)). "Intangibles such as love, comfort, security, and stability are

involved in the inquiry into the needs and welfare of the child." ***In re***

***C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005). The trial court must also

"discern the nature and status of the parent-child bond, with utmost

attention to the effect on the child of permanently severing that bond." ***Id.***

The mere finding of a parent-child bond does not preclude termination

of parental rights. Rather, the trial court must examine the status of the

bond to determine whether its termination "would destroy an existing,

necessary and beneficial relationship." ***In re Adoption of T.B.B.***, 835 A.2d

387, 397 (Pa. Super. 2003). "[A] court may properly terminate parental

bonds which exist *in form* but not *in substance* when preservation of the

parental bond would consign a child to an indefinite, unhappy, and unstable

future devoid of the irreducible minimum parental care to which that child is

entitled." ***In re J.W.***, 578 A.2d 952, 958 (Pa. Super. 1990) (emphasis in

original).

In addressing the best interests and welfare of Child, the trial court

found:

> Throughout the history of this proceeding, the record is
> unequivocal that the kinship foster parents have essentially filled
> the void created by the natural parents' unwillingness to provide
> parental care. While in kinship foster care, [Child's] overall well-
> being has been positive. [Child] perceives the kinship foster
> family as family and refers to the foster parents as "Mom" and

"Dad." While with the kinship foster family, she has become attached to three quasi-siblings who she treats as sisters. In contrast, the only bond between [Father] and [Child] which developed during sporadic visitations has been described as one of "playmates." There is no other evidence of record. As Father has essentially not been actively involved in the 21[-]month old child's life since her birth, this Court shares in the opinion of the kinship foster providers that [Child's] well-being will only be jeopardized by delay in arranging permanency for [Child]. [Child's] guardian ad litem concurs in this conclusion.

Trial Court Opinion, 5/24/17, at 8-9.

Our review of the complete record supports the trial court's finding that Child's primary bond is with her foster family rather than with Father. Further, the record supports the trial court's finding that Child will not suffer irreparable harm if Father's parental rights are terminated. It was within the trial court's discretion to accept the testimony of Ms. Hernandez and Paternal Aunt, and to conclude that the benefits of a permanent home with Paternal Aunt would outweigh any emotional distress Child might experience if Father's parental rights were terminated.

Based on the record before us, we discern no error or abuse of discretion in the trial court's conclusion regarding subsection (b) that Child's developmental, emotional, and physical needs and welfare are best met by terminating Father's parental rights. Where the trial court's determination is supported by the record, this Court must affirm. *In re R.L.T.M.*, 860 A.2d 190, 191 (Pa. Super. 2004).

Finally, we address Father's challenge to the order changing Child's permanency goal to adoption. Father argues that the trial court erred in

changing Child's permanency goal from reunification to adoption because CYS created "severe obstacle[s] to the very foundation of a family's reunification." Father's Brief at 28. In particular, Father alleges that CYS reduced or suspended his visitation with Child and, thus, prevented Father from reunifying with Child. *Id.* at 25-30.

> In cases involving a court's order changing the placement goal . . . to adoption, our standard of review is abuse of discretion. To hold [that] the trial court abused its discretion, we must determine that its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008) (internal citations and quotation marks omitted). However, we are mindful that, "[w]hen the trial court's findings are supported by competent evidence of record, we will affirm 'even if the record could also support an opposite result.'" *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006) (quoting *In re Adoption of R.J.S.*, 901 A.2d 502, 506 (Pa. Super. 2006)). Furthermore, this Court has stated:

> Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S. §§ 6301-65], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency

proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over all other considerations, including the rights of the parents.

*Id.* (internal citations and footnotes omitted).

When considering a petition for goal change for a dependent child, the trial court considers:

the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (citing 42 Pa.C.S. § 6351(f)).

Additionally, Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

**(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

\* \* \*

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f.1).

"The trial court must focus on the child and determine the goal with reference to the child's best interests, not those of the parents." *In re S.B.*, 943 A.2d at 978. As this Court has held, "[a] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re N.C.*, 909 A.2d at 824 (quoting *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003)) (alteration in original).

In this case, the trial court changed Child's permanency goal to adoption, finding as follows:

> Father made absolutely no effort towards reunification other than exceedingly sporadic visitation. His employment and housing stability was either unverifiable or in constant fluctuation. Most alarmingly, he failed to address potentially dangerous mental health issues[,] which apparently were diagnosed as early as 2014 and observed independently by both Dauphin [CYS] and Adams [CYS]. The possession of a firearm and nature of criminal charges instituted against Father, as well as his flagrant disregard for the safety of [Child] by transporting her while on a suspended license, evidenced the potential risk to [Child]. As this history was consistent since [Child] was taken into custody at her birth in August of 2015, there can be no doubt that Father, by conduct continuing for a period of at least six months, has refused or failed to perform parental duties. Indeed, Father does not contest this finding in his Concise Statement of Matters Complained of on Appeal.

Trial Court Opinion, 5/24/17, at 6-7.

The trial court specifically addressed Father's allegation of "punitive suspension of visitation" by CYS as follows:

> Although the foregoing is sufficient to support the finding for termination, this writer feels compelled to address a reference in [Father's] Concise Statement of Matters Complained

- 21 -

of on Appeal which raises an implication of punitive suspension of visitation between Father and [Child]. This implication is simply contrary to the record. Throughout the history of this matter, [CYS] made significant effort to increase Father's visitation with [Child] towards the goal of reunification. [CYS's] effort however was met by an attitude of inconsistency, concealment, and defiance. For instance, Father was excessively sporadic in exercising visitation at great inconvenience to the kinship foster parents. Indeed, on occasion, Father did not even attend court proceedings. In explaining these lapses, Father regularly alluded to work obligations yet adamantly refused to provide employment documentation for [CYS] to confirm his representations or to permit accommodation. When initially provided opportunity for unsupervised visitation, Father illegally transported [Child] with a suspended license and failed to disclose the same to [CYS]. While he has consistently represented to [CYS] and [this c]ourt that his significant mental health issues were being addressed, as of this writing, there is no verification for the same. His interaction with service providers was terminated by the providers due to non-cooperation. Finally, he was regularly secretive about his living arrangements and information relevant to his ability to care for [Child]. All these actions were consistently repetitive under the umbrella of a history of dangerous mental instability including: (1) a depressive and suicidal psychiatric diagnosis; (2) possession of a concealed firearm while interacting with in-home service providers; (3) blatant disregard of court directives by two prior judges prohibiting his possession of firearms; (4) operating a motor vehicle while under suspension and in possession of emergency lighting devices which he was not qualified to use; (5) conviction of criminal charges wherein it is alleged he impersonated a constable to assist in his commission of burglary; (6) consistent misrepresentation to [CYS] and this [c]ourt concerning his attendance at anger management and mental health counseling; and (7) an attitude evidencing a clearly open defiance to authority which was apparent at numerous court proceedings. Despite this umbrella of concern, [CYS] continued to make efforts and accommodations to arrange visitation until it became clear that the Father simply had no intention of addressing the issues which caused the original placement. Indeed, this [c]ourt observed Father's demeanor at various proceedings and, in light of the history and record, has no hesitancy in concluding that left untreated, Father presents a

grave threat to both [Child] and social service providers.[2]

> [2] While it is true [CYS] did not arrange visitation between the Father and [Child] while incarcerated, for some period of time [CYS] was unaware of Father's residence or incarceration. On the other hand, Father was continuously represented by counsel and obviously aware of [CYS's] involvement however failed to take any act to alert [CYS] of his location or request visitation contrary to his obligation of affirmative performance in exercising parental duties. *In Re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003).

Trial Court Opinion, 5/24/17, at 9-10.

In this case, our review of the record compels us to conclude there is ample support for the trial court's conclusion that Father will not attain the skills necessary to parent Child within a reasonable period of time, and that requiring further reunification efforts would only serve to delay permanency for Child. Father is minimally compliant with the objectives set forth by CYS. Specifically, as previously discussed, Ms. Hernandez testified that Father is consistently late for visits or fails to confirm his appointments; has not verified his employment or provided CYS with a work schedule; has not secured stable housing; and has failed to complete anger management and parenting classes. Finally, Child is well-bonded to her foster family. Child's foster family meets all of her needs, and she is thriving in their care.

Thus, we conclude that the trial court did not abuse its discretion by changing Child's permanency goal to adoption. The record confirms that Father has made no progress since Child entered foster care and has

actually regressed in his parenting abilities. Moreover, Child entered foster care several days after her birth and has not resided with Father for any significant period of time. Child is bonded with her foster family and is thriving in their care. As this Court has explained in the context of involuntary termination of parental rights proceedings, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). Accordingly, we discern no abuse of the trial court's discretion in its conclusion that a change in Child's permanency goal to adoption is in the best interest of Child. *In Interest of: L.Z.*, *A Minor Child*, 111 A.3d 1164, 1174 (Pa. 2015).

Orders affirmed.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/6/2017